COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Chief Judge Decker, Judges Raphael and White

HEATHER K.L. CORPIN

v.      Record No. 1210-23-2

CITY OF FREDERICKSBURG DEPARTMENT
 OF SOCIAL SERVICES                                    MEMORANDUM OPINION[*] BY
                                                      JUDGE KIMBERLEY SLAYTON WHITE
FERNANDO MONTERO LABOY                                     JULY 2, 2024

v.      Record No. 1440-23-2

CITY OF FREDERICKSBURG DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Gordon F. Willis, Judge

(Emily E. Gold; Select Law Partners, PLLC, on brief), for appellant
Heather K.L. Corpin.  Appellant submitting on brief.

(Timothy W. Barbrow; Law Office of Timothy W. Barbrow, on
brief), for appellant Fernando Montero Laboy.  Appellant
submitting on brief.

(Robin N. Krueger; Elizabeth Carpenter-Hughes, Guardian ad litem
for the minor child; The Law Office of Robin N. Krueger, PLC;
Buczek Carpenter PC, on brief), for appellee.  Appellee and
Guardian ad litem submitting on brief.

Heather K.L. Corpin (mother) and Fernando Montero Laboy (father) appeal the circuit

court's orders terminating their respective parental rights under Code § 16.1-283(C)(2) and

approving the foster care goal of adoption.  Mother and father jointly contend that there was

insufficient evidence that they were unwilling or unable to substantially remedy the conditions

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

which led to their child entering foster care. They further argue that there was insufficient evidence that termination of their parental rights was in the best interests of the child. Mother separately contends that there was insufficient evidence that no immediate relative was suitable for the placement of the child. Father argues separately that there was insufficient evidence to support the recommendation that changing the foster care goal of adoption was in the child's best interests. As all parties have waived oral argument, we examine the briefs and the record, find no error, and accordingly affirm the trial court's judgment.

BACKGROUND[1]

On appeal, we "view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department." *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).

Mother and father are the biological parents of the child who is the subject of this appeal, and they resided in West Palm Beach, Florida, when these events began. On September 1, 2021, mother and the then-two-year-old child were traveling to New York from Florida when mother tried to access Marine Corps Base Quantico "seeking protection from people who were out to get her and [the child], and [claiming] that the NSA had instructed her to go to the Pentagon." She stated that she wanted to "provide blood to a physicist, claiming her blood was rare and could cure diseases." Further, she stated that her "daughter was the Messiah" and "that her other children were [at Quantico]."

---

[1] The records in these cases were sealed. "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only the facts mentioned in this opinion; the rest of the record remains sealed. *Id.*

United States Marine Officer Collazo questioned the mother about the condition of her car and child. Officer Collazo discovered that the child had been laying in urine and feces for some time with a diaper rash; he also found soiled clothing and seats, along with a roach infestation, in the car. Mother told the officers that she had been "up and down the east coast from Florida to New York seeking protection."

Based on his interactions with mother, Officer Collazo called emergency medical services to transport mother and the child to the local hospital in Fredericksburg on an emergency custody order (ECO). Officer Collazo called father, who reported that mother was severely bipolar and that she recently had a mental health evaluation in Florida. Father added that mother had another child who was "removed" by Florida Child Protective Services.[2]

The hospital contacted the Fredericksburg Department of Social Services (the Department), which started its investigation. At the hospital, the Department discovered that the child's clothing was dirty and that her hair was unwashed and contained dirt and dry skin. The child, however, was walking around, smiling, and waving to the officers. The hospital admitted mother for psychiatric care.

Father told the Department that he was trying to get a flight from Florida and that there were no relatives or friends nearby to take the child. When the Department advised mother that it had to take custody of the child because there were no other placement options, mother stated that "that would be a huge mistake" and there would be "an international incident" if that occurred; mother also threatened one of the police officers.

Father spoke with a family services specialist on September 2, 2021, and told her that the mother goes through these manic episodes in a six-month cycle. He described the mother as violent

_____

[2] In fact, the child who is the subject of this case is the mother's fourth, with all three older children having been removed from her care by the State of Florida due to the mother's mental health.

in many of these episodes, even to the point of strangling him. Despite knowledge of these episodes, father endorsed the mother's trip up the east coast with the child.

The Juvenile and Domestic Relations District Court for the City of Fredericksburg (the JDR court) entered an emergency removal order on September 2, 2021, and a preliminary removal order one week later. One month later, the JDR court adjudicated that the child was abused or neglected and without parental care due to "the unreasonable absence or the mental or physical incapacity" of the parents. The JDR court subsequently held a dispositional hearing on the underlying petition and foster care plan, approved the foster care plan with a goal of returning home or relative placement, and continued the child's custody with the Department.

After the child entered foster care, the Department established requirements that mother and father each had to complete before the child could be reunited with them. These included completing psychological evaluations and parental capacity evaluations and following the recommendations of the evaluators and service providers. Compliance with any prescribed medication management, submitting to random drug screenings, and testing negative for substances not prescribed was integrated into the plan for both parents. Before the child could return, mother and father were to obtain and maintain stable housing for at least three months and to have stable employment so they could provide for the child. They were to participate in couples counseling. Finally, both were to be consistent with visitation services and guidelines to ensure that the child's medical, physical, psychological, and developmental needs were met. Additionally, mother's plan included cooperating with medication management services, and father's plan included complying with the Interstate Compact on the Placement of Children (ICPC) process.

When the mother was released from the hospital, she obtained an apartment in Spotsylvania County, Virginia. Father eventually relocated from Florida and moved in with mother. While they maintained the same housing throughout the pendency of the proceedings,

the police had responded to the home for calls of domestic violence. Both secured and maintained employment. Mother started as a cab driver and limousine driver. She later was hired at a hotel as a housekeeper. Father worked for the same cab company but left to return to construction work. The parents attended all the monthly meetings with the Department, the Family Partnership Meetings, and the Family Assessment and Planning Team meetings, although mother threatened the Department during one meeting. The parents participated in couples counseling; however, mother and father told the counselor that they did not intend to continue with counseling if the child was returned to them. The parents also consistently participated in visitation with the child.

As early as two weeks after the child was placed in foster care, mother was "very adamant that she was not willing or wanting to be put on medication" for her bipolar disorder diagnosis and repeated her position to the Department several times. She stated that she was "not an advocate or very cooperative with medication management" and that she discontinued the medication prescribed from her September hospitalization because she did not like the side effects. She said she would do "talk therapy" without medication management.

Mother's mental health remained a concern throughout the pendency of this matter; mother did not comply with the medication management requirement incorporated into the foster care plan at the JDR court. She continued to smoke marijuana, which father provided, and she questioned why she needed medications. She went to the Department for a visitation that had been cancelled and became "very upset" and started yelling, cursing, "chasing a worker," and seeking entry into private work areas. The Department called the police, mother was barred from the building, and visitations there ceased. Later that month, mother went to the hospital in search of her children and was eventually served with an emergency custody order that returned her to inpatient psychiatric

treatment. Mother attributed the psychosis to the recent traumatic death of her son in Florida.[3]

Following that hospitalization, mother told the Department that "she would take medication during the life of this case if she was court ordered to do so, but she did not intend for that to be long-term treatment for her after the foster case was concluded."

Mother also "shared concerns that [the child] was being trafficked" because she saw a baby doll at the foster home, and she believed that was evidence that the child was "being trafficked." Despite the JDR court's order to remain on medication and continue with therapy, mother was not complying with her medication. The Department conducted a pill count in October 2022, finding eight doses not taken. Mother admitted to missing "some" doses but disputed the number. The Department related that mother's compliance with services through Rappahannock Area Community Services Board (RACSB) was marked by two no call/no show appointments and five cancellations and that mother changed providers after November 2022 and was undergoing individual counseling.

Mother's psychological assessment and parenting evaluation revealed that she was "slow to accept her mental illness, or accept needed medication to control it, she has recurrently decompensated into bouts of intense mania that have served to cause significant legal, social, occupational, and family problems." The evaluator stated that "[mother] does not . . . appear to be in position to safely and effectively manage the parenting demands" of the child and recommended that she remain on "relevant psychiatric medications needed to control bipolar I disorder," something mother was unable to do even while trying to regain custody of the child.

When the child came into foster care, father told the Department that the family was facing homelessness in Florida and that he sent mother to look for housing using his vehicle. He believed

---

[3] In February 2022, the mother's biological son who was in foster care in Florida was killed in an accident. Her mental state deteriorated quickly after this event.

she went to New York where her father lived. He reported that mother went "into these manic episodes" cycling "every six months on the dot" and that even though he recognized she was in a "manic, mental health crisis when she left" Florida, he allowed the child to go with her. He said he had not been in contact with mother for three weeks but expressed no concern for the child's or mother's safety.

Father's compliance with the Department's requirements for reunification was similarly unsuccessful. The Department reported that father was working on a separate placement plan in Florida to regain custody of the child and that the ICPC application process had begun but was discontinued when father relocated to Virginia. During the pendency of the foster care placement matter, there was a domestic violence incident when father chose to leave the apartment because of mother's threatening behaviors. A few months later, he reported that mother physically assaulted him after an argument about infidelity. He further described a 2017 battery when mother, who "was just in a crisis," "strangled him and left him for dead" as he was "about to lose consciousness." He also related that he was "concerned that [mother] was going to stab him in his sleep."

Father told the investigating deputy that he was "willing" to relinquish seeing the child and to "leave the area just to avoid having any further contact with [mother]." He said that "he would essentially try to forget, do what he had to do, [and] to try to forget" the child "if he had to." Father told the Department that he "[was] able to see into the future . . . and feel and know when things [were] going to happen, bad things [were] going to happen."

Father also spoke about the need for his own mental health therapy, and he said that he and mother were setting that up. His psychological assessment and parenting evaluation revealed that, although father had adequate capacity to care for and supervise the child, his partnership with mother was "seriously problematic" and the evaluator "could not ensure that the child would be safe

around mother while he was at work." Further, father's continued use of marijuana around mother worked "against mother's needed sobriety from that substance."

The Department provided weekly supervised visitation until February 2023, when the JDR court terminated their parental rights. Additional services included offering funding for transportation services and funding a down payment for a vehicle. The Department funded and made referrals and scheduled appointments for the required psychological assessments and parenting evaluations for mother and father. Health and dental care were offered to mother, as was medication management through the RACSB. The Department also funded the couples' counseling, which was part of the foster care services plan.

In December 2022, the Department determined that neither mother nor father was making substantial progress to remedy the conditions that had caused the child to go into and remain in foster care for over 15 months. The Department recommended changing the foster care goal to adoption. There were continued concerns about mother's and father's minimization of mother's mental health diagnosis, symptoms, and necessary management, including medication. The Department noted that mother was unwilling or unable to "meet her own mental health needs on a long-term basis." Similarly, father was unwilling or unable to "meet his own basic and emotional needs," had "shown poor judgment in making decisions concerning his own safety and well-being," and had "shown an inability to maintain independent financial and housing stability during the life of the case." The Department characterized mother and father's relationship as being "in constant dysfunction." They appeared "unable to demonstrate the capacity to meet the child's basic and emotional needs in addition to the child's needs for a safe and nurturing environment, and they had "not made substantial progress on the foster care service plan."

When the Department discussed the change in the foster care goal, father stated that he did not agree with the recommendation and that mother was "a good mother and that there were no

concerns." He added that mother was "seeking assistance and [that] she was a good mother in going to Quantico to ask for help." Mother added that "this was supposed to be a success story and that [the proceedings] should not be happening and that she was a good mother in seeking help for [the child] on that day." Neither parent articulated any insight into the threat posed by mother to the child.

After hearing the evidence presented on February 2, 2023, the JDR court terminated mother's and father's parental rights, finding by clear and convincing evidence that they had been unwilling or unable to substantially remedy the conditions that led to the child's placement in foster care under Code § 16.1-283(C)(2). The JDR court's order granted the Department the authority to place the child for adoption. Mother and father appealed.

At the circuit court trial, the Department reported that the child was "doing well" in foster care. When first placed, the then-two-year-old child would yell and scream in response to questions. The Department described the child's development at nearly four years of age as speaking in full sentences, engaging socially and positively, displaying confidence, and participating in preschool. The child had no reported developmental or behavioral problems. Her relationship with the foster parents was healthy and supportive, and the Department expressed no concerns for the child's development. The Department indicated that adoption continued to be in the best interest of the child because the child needed a protective caregiver and there were no viable relative placements.

Mother testified at the circuit court trial that her "mind was broken" and that she had "delusions" about her dead son and a surviving daughter that were exacerbated by the "significant racial profiling" and "covert racism" she experienced in Florida. She stated that she "didn't need medication management until after [her] son died [in 2022]" and that in her six involuntary hospitalizations before he died, she "was given multiple diagnos[e]s that [she] did

- 9 -

not agree with." When asked about her mental health cycling for years, she initially made statements about homelessness and law enforcement harassment in Florida, then stated that she did not believe that she was "cycling through a mental health disease" before the child entered foster care. When asked about an incident in 2013 when she had alleged that "white supremacists and federal agents were going to kidnap the children and have her murdered," she attributed that to racism and living in a "hostile" environment.

Mother testified that at the time of the initial incident at Quantico she was "under extreme stress and not in her right mind." She acknowledged that she was noncompliant with medication management after the first hospitalization and claimed that otherwise, she was compliant with the Department's requirements. She also testified that before the incident at the Department she was "not seeking any help or treatment" other than therapy, which she had stopped two weeks before the incident. Furthermore, she admitted that she did not take her medication as prescribed because she did not like the side effects. Mother stated that her position on medication had changed after her latest hospitalization and that she intended to continue taking the medications.

Mother stated that the incident at Quantico happened because "the problem [she] had at that time was housing stability" and someone told her to go to Fort Belvoir to seek assistance with housing. She denied stating that people were "out to get her and the child" but stated that she had experienced "significant racial profiling."

Father testified at the circuit court trial that he completed a parenting class once he learned the child might come into care in Virginia and that he and mother were enrolled in couples counseling. When asked how he planned to keep the child safe if mother had another mental health episode, he maintained that she was not going to have another episode, but if she did, he had a plan that he did not want to reveal in front of her.

Dr. Leigh D. Hagan, an expert in the field of forensic and clinical psychology, reviewed the Department's information, including the psychological and parenting evaluations for mother and father, mother's treatment records from the hospital and outpatient facilities, the information from the domestic assault incidents, and mother's child protective services files from Florida. Dr. Hagan provided expert testimony at the circuit court trial that there were no further services that the Department could have offered that "would have made a substantive outcome change." Dr. Hagan stated that mother and father have "sufficient cognitive resources" to "successfully and safely parent a child," but that mother's mental health diagnosis and her noncompliance with treatment was a bar to reunification. As for mother's mental health, he stated that there was a "well-engrained, long-standing, and enduring maladaptive pattern that's reflective over at least ten years" and that it was difficult to manage the personality structure. Dr. Hagan further concluded that father lacked the capacity to provide safe and protective parenting for the child, outlining father's "inability . . . to protect the child" when he allowed mother, who had a "significant mental disorder," to travel with the child alone in a car for two weeks. Dr. Hagan testified that "there was a high level of risk for [a] repeat of the patterns and harmful cycle behaviors . . . on both the part of mother and father." He further opined that there was a "high level of risk" that the child would be exposed to future abuse and neglect in the care of mother and father.

The Department presented evidence at the circuit court trial that it began its efforts for relative placement when the child initially went into foster care. Father told the Department that there were no friends or family members nearby to take the child. The Department sought relatives for placement using a "family-finding data base" to generate leads and sent letters to everyone identified but without response. Mother and father identified three possible relative placements, including Travis Corpin ("Travis"), Janine Gudger ("Gudger"), and Jessica Montero ("Montero").

The Department contacted each person. Montero expressed no interest in obtaining custody of the child. Gudger, although interested, was denied her application to the ICPC and had no further contact with the Department. Other relatives contacted, including mother's brother and half-sister, "wa[]vered in their position to care for the child."

Travis, who fostered one of mother's older children in Colorado for a time, initially declined consideration for placement because he hoped that mother and father would be reunited with the child. Travis considered himself very close with his sister, the mother, and stated that they lived together on-and-off through their adult life. The Department continued to work with him after he requested the information to proceed with the ICPC application process several months later.

Travis testified he met the child "online shortly after she was born" and in person for the first time in 2022 at the funeral of mother's son. Travis sought virtual visitations, but that failed when the case worker left. After having no contact with the Department for months, Travis filed petitions for custody and visitation, which were pending at the time of the circuit court hearing. He testified that a representative from the Colorado Department of Social Services contacted him to conduct a home study, but "it had been rescinded" with no further explanation.

Acknowledging mother's mental health, Travis claimed that mother had not been involved in treatment "until recently." Travis further believed that mother's mental health was "looking up." According to Travis, mother "didn't seem" to have any parenting deficits when the child was born, and she appeared "to have gotten her life back together after having the rest of her kids taken from her." He thought that returning the child to father rather than to him was "appropriate."

After hearing the evidence and arguments, the circuit court considered mother's mental health and Dr. Hagan's testimony that mother and father "lack a certain amount of insight into her condition" and what must be done to effectively manage it. The circuit court concluded that

based on the "credible evidence presented" and by "clear and convincing evidence," mother and father had been unwilling or unable to remedy the conditions that led to the child's admission into and continuation of foster care throughout the proceedings. The circuit court also concluded that it was in the child's best interests to terminate mother's and father's parental rights under Code § 16.1-283(C)(2). The parents each appealed.

ANALYSIS

On appeal, we "view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department." *Joyce*, 75 Va. App. at 695 (quoting *Farrell*, 59 Va. App. at 386). "On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Id.* at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

I. Termination of Parental Rights

Mother and father challenge the sufficiency of the evidence to support the termination of their respective parental rights under Code § 16.2-283(C)(2).

Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if it finds, "based upon clear and convincing evidence, that it is in the best interests of the child" and that:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the

- 13 -

reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

The best interests of a child analysis is not a set standard and is extremely fact specific to each case. "'[T]here is no simple, mechanical, cut and dried way' to apply the best interests of the child standard." *Bristol Dep't of Soc. Servs v. Welch*, 64 Va. App. 34, 48 (2014) (quoting *Peple v. Peple*, 5 Va. App. 414, 422 (1988)). "Instead, '[t]he question must be resolved . . . in light of the facts of each case.'" *Eaton v. Washington Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 331 (2016) (alterations in original) (quoting *Toombs v. Lynchburg Div. of Soc. Servs.*, 223 Va. 225, 230 (1982)). "In the end, the 'child's best interests' remain the 'paramount consideration' of the court." *Toms*, 46 Va. App. at 266 (quoting *Akers v. Fauquier County Dep't of Soc. Servs.*, 44 Va. App. 247, 262 (2004)).

The Department initially became involved with the family when mother tried to enter the Marine Corps Base at Quantico claiming that she was being pursued and that the NSA told her to go to the Pentagon, among other bizarre assertions. The child entered foster care because the mother was admitted to a psychiatric hospital and father, who was in Florida, said they had no friends or family in the area who could take the child and that they were facing homelessness in Florida.

The Department required mother to comply with the prescribed medication management and treatment plan following her discharge from the hospital; she consistently failed to do so. She enrolled in therapy at RACSB but did not show up or cancelled some of her appointments.

- 14 -

On numerous occasions, mother emphasized that she would not comply with a medication regimen to manage her bipolar I disorder and had no intention to engage in long-term treatment. She stated that she had never stayed on her medications despite multiple hospitalizations and removal of her other children. During the pendency of these proceedings, mother's non-compliance resulted in two incidents of domestic assault against father and an incident at the Department's office that resulted in her being banned and unable to have visitations with her child there.

The evidence about the father's compliance with the Department's requirements equally supported the circuit court's finding that he had not substantially remedied the conditions that led to, or required continuation of, the child's placement in foster care. He knew that mother was in a manic crisis when she left Florida, at his urging, with the child to look for housing. After the domestic assault incident, he told the deputy that he was willing to abandon the child and return to Florida to get away from mother's behavior. He started the required psychological assessment and parenting evaluation with one provider, but he was not willing to answer some of the questions posed by the provider. Although he was familiar enough with mother's "cycles [that] happened every six months on the dot," he minimized the severity of mother's mental illness, stating that she was a good mother and that there were no concerns. He continued to use marijuana around mother and provide it for her even after being told that it worked against mother's sobriety.

The couple participated in couples counseling for approximately five months. They paused the counseling when father began working out of state, although mother said she intended to resume it. Nevertheless, there were at least two domestic assault incidents from the time the child went into care until the termination of parental rights in the JDR court.

Since placement, the child was thriving physically, emotionally, and developmentally. She was speaking in full sentences and participating in preschool. At the time of the termination appeal in June 2023, the child had been in care more than 19 months with the same family. The evidence showed that the child had bonded to her foster parents who were also a prospective family for adoption.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). The evidence before the circuit court was clear and convincing that neither mother nor father had substantially remedied the conditions that led to the child's placement and continuation in foster care. Additionally, mother had not addressed or corrected the circumstances and behavior that led to her older children being taken from her. Considering the totality of the record and the specific current situation in this case, the circuit court did not err in finding that the termination of mother's and father's parental rights was in the best interests of the child.[4]

II. Placement with a Relative

Mother separately argues that the trial court erred in failing to consider reasonable placement with immediate relatives and in finding that there was no relative suitable for placement. Mother claims that there was an abundance of evidence before the trial court of relatives suitable to accept placement of the child.

---

[4] With respect to father's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of his appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." *Toms*, 46 Va. App. at 265 n.3.

Code § 16.1-283(A) provides that, in terminating residual parental rights, the court "shall give a consideration to granting custody to a person with a legitimate interest." This provision "obligates [the Department] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 567 (2018) (quoting *Brown v. Spotsylvania Dep't of Soc. Servs.*, 43 Va. App. 205, 217 (2004)). "Although mandatory, this obligation is limited." *Id.* The statutory prerequisite is satisfied when the relative testifies before the circuit court, so that it may consider the suitability of placing the child with that relative, as compared with other placement options. *See id.* at 568 (trial testimony of "several relatives" and evidence of the Department's investigation provided circuit court with "ample evidence" to consider relative placements). On appeal of a trial court's decision to terminate parental rights, it is presumed that the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991) (quoting *Farley v. Farley*, 9 Va. App. 326, 329 (1990)).

Here, as in *Castillo*, the Department and the circuit court satisfied their obligations. The Department began searching for relatives for placement as soon as the child was placed in foster care. The database search generated some leads, but no one responded to the Department's letters. In evaluating the three relatives named by mother and father, one relative explicitly declined placement of the child. After another's ICPC application was denied, the Department did not have any further contact with that relative. The remaining relative, previously a foster placement for another of mother's children, had no relationship with the child and had only ever "met" the child over a FaceTime phone call and briefly at a funeral. While the child was in foster care, the relative did not attempt to grow their relationship or learn about the child's

- 17 -

condition or needs. He testified that he was "absolutely aware" of mother's mental health illness and manic episodes, but he never saw it as a "prolonged thing." When asked about the previous children that were taken from the mother, he did not believe that mother and father had any deficits in parenting. In fact, the remaining relative testified that the child should be back with mother and father without question or concern. The circuit court had the opportunity to observe him during his testimony and had ample evidence to consider relative placements.

The circuit court, however, found by clear and convincing evidence that it was in the child's best interests to proceed with the termination of parental rights and the foster care goal of adoption. "Because this Court defers to a lower court's judgment based on evidence heard *ore tenus* unless plainly wrong or without support, it does not disturb the circuit court's ruling that no relatives were suitable placements." *Castillo*, 68 Va. App. at 568 (quoting *Logan*, 13 Va. App. at 128).

## CONCLUSION

In summary, we conclude that the trial court relied on clear and convincing evidence to determine that the termination of mother's and father's parental rights was in the best interests of the child, the parents failed to substantially remedy the circumstances that caused the child to be placed in foster care, and there were no suitable relative placement options. For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*